Filed 1/24/14  Portuguez v. Espiritu CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MAKENNA PORTUGUEZ,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ETHAN ESPIRITU,<br><br>Defendant and Appellant. | D063222<br><br><br>(Super. Ct. No. 37-2011-00060568-CU-HR-NC) |

APPEAL from an order of the Superior Court of San Diego County, Martin W. Staven, Judge.  Affirmed.

Mara C. Allard for Defendant and Appellant.

Daniel M. Horwick for Plaintiff and Respondent.

MaKenna Portuguez obtained a restraining order to prevent Ethan Espiritu, a former friend and high school classmate, from harassing her.  Ethan appeals the order, claiming the evidence was insufficient to support the trial court's finding that he had sent certain unwanted text messages to MaKenna.  We affirm.

# I.

## BACKGROUND

In an application for restraining orders, MaKenna alleged she and Ethan used to be high school classmates and friends. MaKenna alleged their friendship came to an end in the fall of 2011, when Ethan slapped her and had her arrested on false charges of "domestic violence." MaKenna further claimed that over the next several weeks, Ethan continued to contact her and sent threatening messages via a free text messaging service; changed the passwords to her e-mail and other Internet accounts; wrote and sent a letter to his own mother in MaKenna's name; grabbed MaKenna's telephone and threw it to the ground; threatened to flatten her friend Kyle's tires; physically abused and cyberbullied her; frightened her with a gun; and threatened to kill her. Based on these allegations, MaKenna requested orders to stop Ethan from further harassing her. (Code Civ. Proc., § 527.6.)

Ethan filed an answer to MaKenna's application in which he alleged her claims were "fabricated" and asserted he "should be the one filing harassment charges against her." Ethan denied slapping MaKenna, and claimed MaKenna "grabbed [his] right arm [and] pulled very hard" while her friend Kyle shouted accusations and obscenities at Ethan. Ethan further alleged that although he had "no interest" in MaKenna, she "was always trailing [him] in school." Ethan denied interfering with MaKenna's e-mail and other Internet accounts or sending her text messages. Ethan claimed he had no access to her accounts, and MaKenna actually sent him unwanted text and e-mail messages. Ethan also denied MaKenna's other allegations.

2

The trial court issued a temporary restraining order directing Ethan to stay at least 100 yards away from MaKenna; forbidding him to contact, cyberbully, or otherwise harass her; and prohibiting him from possessing a gun. The court also scheduled a hearing on MaKenna's request for a restraining order of longer duration.

At the hearing, MaKenna and Ethan testified and also introduced many documents. We shall present MaKenna's version of events first and then turn to Ethan's. As will appear, the two versions conflict in many respects.

MaKenna testified that in January 2010 she gave Ethan her e-mail address and password so that he could set up a Skype account for her. When Ethan was at her home in December of that year, she gave him the password for her home wireless Internet, and he connected his telephone to her computer. MaKenna testified that whenever she is at home, her telephone automatically connects to the wireless Internet.

According to MaKenna, Ethan started compromising her Internet accounts in mid-2011 and continued to do so for several months. He changed her passwords and enabled a password recovery feature that sent her new passwords to his e-mail account.

MaKenna also testified that in the summer of 2011, various Internet accounts were created in her name. Numerous messages concerning her relationship with Ethan that appeared to be from MaKenna but actually were not, were posted to or sent from these accounts. For example:

> — Several messages were posted over the course of a week on a Twitter account that included MaKenna's name and a photograph from her Facebook page. Some messages contained abusive and obscene language that expressed anger over the termination of the relationship, while others

3

mentioned a "Cinderella story" and expressed sadness the relationship had ended.

— Comments posted on a YouTube channel called "kutiekenna11," a combination of a nickname for MaKenna and the number of Ethan's lacrosse jersey, suggested MaKenna was lonely and wanted to rekindle a relationship with a former boyfriend.

— The following message was sent from an e-mail address containing MaKenna's name to Ethan's e-mail address: "I love you, Ethan. Don't ever forget it. If this is the end, always remember that I'll be here for you. If you found someone else, I wish you the best, but I thought you promised you'd never leave."

MaKenna further testified that she received numerous unwanted communications from Ethan in the summer and fall of 2011. For example:

— In June, MaKenna saw a photograph of a bride and groom kissing, which she claimed Ethan had posted on the Internet. "Ethan and MaKenna" appeared at the top of the photograph, and "Forever" appeared at the bottom. A few days later, MaKenna received an instant message from Ethan that said: "[H]ahaha. . . . [G]otta love this picture!!! <3 [I] luv Natalie[.] ☺ [F]**k you. [I] never loved you[.] I was only being nice."

— In July, Ethan sent MaKenna nine text messages between 2:10 and 2:35 a.m. while she was visiting a friend in Texas. These messages annoyed MaKenna and disturbed her sleep.

— In October, Ethan sent MaKenna the following text message: "You['re] the only thing that picks me [up] when [I']m down and [I']m addicted to us. I[']ll never find anyone like you[.] Baby[,] you['re] my number one and if you['re] leaving me[,] [I] don[']t know what [I']m going to do[.] [I]f this is what you want[,] then[] this is my goodbye to you[.] [I] will always be here for you. Never forget that."

— In November, MaKenna received a series of text messages from Ethan while she was riding home from school with her friend Kyle. One of the messages stated: "I knew you were a cheat. You always were. You lying bitch. I hope they [f]**k you and get you pregnant so you can kill another one." Another stated: "Girl[,] [I] hate you. I wish[] you would disappear. You messed up so don[']t even come around me." When MaKenna received these messages, she "was upset that [Ethan] would talk to [her] that way."

4

— Later in November, Ethan sent MaKenna three instant messages. One stated: "I love you MaKenna Victoria Portuguez/Espiritu." Another stated: "I love you so much but you keep hurting me[.] [¶] I don[']t know why you don[']t get that." And the third stated: "'[I] don[']t want another pretty face, [I] don[']t want just anyone to hold, [I] don[']t want my love to go to waste, [I] want you and your beautiful soul.'"

From December 2011 through February 2012, MaKenna testified she received several text messages through a service called Pinger, which allows subscribers to send text messages without paying a fee. The messages included the following:

— "Keep talking to Kyle and my revenge will be flattening his tires."

— "I just played our old song and man it's crazy how things have changed. This time last year I would have never imagined things like this. I miss you and hope wherever you are and whatever you're doing, you're happy. Don't worry about me. I'm surviving one day at a time."

— "You left [C]atholic school to go to a public school. Now you left public to go back to a private [C]atholic school? If you think you're escaping the problem, you aren't. I asked people and they wouldn't tell me but I have my ways of finding things out." MaKenna found this message "pretty odd and scary."

— "I don't know why you keep changing your number when all I want to do is talk to you. [S]eeing you Friday made me realize what I've lost. [P]lease answer back. I miss you."

Records obtained from Pinger listed an account username that combined a nickname for MaKenna with Ethan's date of birth, contained the e-mail address that was created in MaKenna's name in the summer of 2011, and showed the messages originated from IP addresses for MaKenna's telephone and home wireless Internet. MaKenna denied sending the messages.

MaKenna testified she transferred to a different high school the day after she received the text message from Ethan about flattening her friend Kyle's tires because she

5

"was tired of the harassment from Ethan."  She also testified she wanted a restraining order because she was "afraid of Ethan" based on his creation of Internet accounts in her name, impersonation of her, sending her messages, and attempts to find out her mobile telephone number and location.

In support of her application for a restraining order, MaKenna called Jeffrey Tutton, a computer security specialist, to testify as an expert on cyberimpersonation. Tutton testified that every device manufactured by Apple Inc. has a unique device identifier (UDID), and every device connected to the Internet (whether manufactured by Apple Inc. or another company) has an Internet protocol (IP) address to and from which electronic information is sent.  According to Tutton, the UDID of another person's telephone can be obtained by physically accessing the telephone, or by running readily available UDID detection software on one's own telephone while it is connected to the same wireless network to which the other person's telephone is connected or while it is physically connected to a computer on the other person's network.  Tutton also explained that the IP address of a device connected to the Internet can be obtained by physically accessing the device; by obtaining the password for the network to which the device is connected, accessing the network, and running an Internet connection speed test on the network; or by sending an e-mail and getting a response stating that the e-mail was opened and identifying the IP address of the device on which it was opened.  Finally, Tutton testified that by obtaining the UDID and the IP address for another person's telephone, entering the UDID into a program on one's own telephone, and remotely accessing the other person's IP address, one can send from his own telephone text

6

messages that appear to have been sent from the other person's telephone. According to Tutton, to be able to do this does not require a great deal of sophistication: "[M]y grandma couldn't do it. But . . . my teenaged son probably would be able to do that by watching a few videos on YouTube or something."

At the hearing, Ethan's testimony differed substantially from MaKenna's. In particular, Ethan contradicted MaKenna's testimony about his access to her home Internet and her Internet accounts. Ethan denied he ever connected his device to the wireless Internet at MaKenna's house, but admitted he logged on to her home computer with her and accessed a Web site. Ethan admitted changing some of MaKenna's Internet account passwords because he was angry, but denied ever compromising her Google e-mail account.

Ethan's testimony about his relationship and communications with MaKenna also differed markedly from hers. Ethan testified he broke up with MaKenna in mid-October 2011 and "didn't want to do anything with her anymore." He admitted he sent her the message in November 2011 calling her a "cheat" and a "lying bitch" because he was angry that she was with Kyle, but he denied ever threatening to flatten Kyle's tires. Ethan also denied sending other messages MaKenna claimed she had received from him after the breakup. In fact, Ethan testified, he received several unwanted messages from MaKenna, including the wedding photograph.

Finally, Ethan testified he never had a Pinger account and never sent MaKenna any text messages through Pinger. He testified he received through Pinger text messages that contained a heart symbol (<3), which nobody but MaKenna had ever sent him.

7

Ethan denied cyberimpersonating MaKenna. He testified that such accusations "made [him] very jumpy," and he found it "nerve-racking that someone [was] using his name and . . . texting other people . . . . [I]t's made [his] life a wreck. It's ruined [his] . . . social life at school."

At the conclusion of the hearing, the trial court stated the case essentially presented a credibility contest: "There is an overwhelming amount of evidence clearly, in part, people are not telling the truth. I don't think MaKenna told the truth about everything. I think Ethan probably told the truth less than she did." The court found Ethan had access to MaKenna's UDID and IP address and did not need ever to possess her telephone to gain that access. The court further found Ethan harassed MaKenna by "totally undermining the computer system, phone system, changing passwords, round and round and round with all of the trouble that would cause." Based on its view of the evidence, the court found that Ethan engaged in "a conscious, . . . clear and convincing campaign of disrupting [MaKenna's] life, messing up the whole system. She ended up going to several different schools." The court therefore granted a three-year restraining order on the same terms as the temporary restraining order.

## II.

## DISCUSSION

Ethan argues the restraining order must be reversed because it "is contrary to substantial evidence in the record." (Capitalization and boldface omitted.) We disagree. The evidence, though conflicting, was sufficient to support the order.

8

A.     *Standard of Review*

"The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record." (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188.) Evidence is substantial if it is reasonable, credible, and of solid value such that a reasonable person might accept it as adequate to support a conclusion. (*Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164; *Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 (*Schild*).) In reviewing a record for substantial evidence, we resolve all factual conflicts and credibility questions in favor of the prevailing party and draw all reasonable inferences in support of the trial court's order. (*USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444; *Schild*, at p. 762.) "If appellate scrutiny reveals that substantial evidence supports the trial court's findings and conclusions, the judgment must be affirmed." (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 697.)

B.     *Legal Analysis*

A person who has suffered harassment may seek an injunction prohibiting further harassment. (Code Civ. Proc., § 527.6, subd. (a)(1).) As pertinent to this appeal, "'[h]arassment' is . . . a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (*Id.*, § 527.6, subd. (b)(3).) A "'[c]ourse of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short,

9

evidencing a continuity of purpose, including . . . making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means . . . ." (*Id.*, § 527.6, subd. (b)(1).)  If after a hearing the trial court "finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment."  (*Id.*, § 527.6, subd. (i).)

Here, the evidence was sufficient to justify the challenged order.  The trial court heard testimony directly from Ethan that he disrupted MaKenna's Internet accounts by changing the passwords and sent her text messages containing angry and obscene language after the breakup of their relationship.  The court also heard testimony directly from MaKenna that over the course of several months, Ethan sent her numerous unwanted electronic communications, some professing love for her and others hatred.  The court could infer from MaKenna's testimony that Ethan had created Internet accounts in her name and posted private information about the status of their relationship and MaKenna's emotional state.  Tutton provided expert testimony from which the court could infer that Ethan cyberimpersonated MaKenna by using the Pinger account to send her threatening text messages and make it appear that she had sent them herself.  Such a "socially unacceptable course of conduct would have seriously alarmed, annoyed, or harassed a reasonable person, and would have caused a reasonable person to suffer substantial emotional distress."  (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1414 (*Brekke*).)  Indeed, MaKenna testified that Ethan's barrage of unwanted communications disturbed her sleep and made her so upset and fearful that she had to change schools.  We

10

therefore conclude substantial evidence supports the trial court's issuance of the restraining order.  (Code Civ. Proc., § 527.6, subds. (a)(1), (b)(3), (i); *Brekke*, at p. 1415.)

Ethan contends the restraining order must be reversed because the trial court's "essential factual finding" that he sent the text messages that were delivered to MaKenna through Pinger "is contrary to the expert testimony."  According to Ethan, Tutton testified that "momentary possession" of MaKenna's telephone was required to obtain the UDID, but it was "uncontroverted that [Ethan] never had possession of the device."  Ethan further contends reversal is required because "*all* the evidence shows" that MaKenna "was texting herself out of spite due to being rejected by [Ethan]."  (Italics added.)  We disagree.

The evidence about who sent the messages through Pinger presented a factual dispute for the trial court to resolve.  MaKenna and Ethan both denied sending them, but the court expressly found MaKenna more credible than Ethan.  The records obtained from Pinger showed the messages originated from a UDID and IP address belonging to MaKenna, but Tutton testified that a person who had physically accessed MaKenna's telephone *or whose device was connected to her wireless Internet network while her telephone was also connected* could obtain the UDID and IP address and later use that information to send a text message from some other device and make it appear the message had been sent from MaKenna's telephone.  Although at the hearing no evidence was presented that Ethan had physical access to MaKenna's telephone, based on Tutton's testimony, Ethan could have obtained MaKenna's UDID by remotely accessing her home wireless Internet network (for which she testified Ethan had the password) at any time her

11

telephone was connected.  Thus, while some evidence supported Ethan's theory that MaKenna sent herself the text messages through Pinger, other evidence supported MaKenna's theory that Ethan sent them and made it look like she did.  "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)  We thus defer to the trial court's resolution of these factual disputes and credibility questions in favor of MaKenna. (*Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 959; *Schild*, *supra*, 232 Cal.App.3d at p. 762.)

In any event, as the trial court recognized, who sent the messages through Pinger was "not the only fact in the case."  Even if we disregard the evidence in favor of MaKenna on that issue, other evidence established Ethan's harassment of MaKenna.  For example, there was evidence that Ethan (1) disrupted MaKenna's Internet accounts by changing the passwords on multiple occasions; (2) set up false Internet accounts in her name and posted private information about her; (3) disturbed her sleep by sending her nine text messages within 25 minutes; and (4) sent her multiple messages that contained obscene or threatening language and that caused her to switch schools to get away from him.  Based on this evidence, the trial court was justified in issuing the challenged restraining order.  (See Code Civ. Proc., § 527.6, subds. (a)(1), (b)(3), (i); *Brekke*, *supra*, 125 Cal.App.4th at pp. 1414-1415.)

12

DISPOSITION

The restraining order is affirmed.  Respondent is awarded costs on appeal.


IRION, J.

WE CONCUR:


HALLER, Acting P. J.


McDONALD, J.

13